# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | |
|---|---|
| GARY LYNN WEEKS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.  3:16-cv-1379-MHH-JHE |
| ) | |
| TIM RAY, et al, ) | |
| ) | |
| Defendants. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The plaintiff filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights. (Doc. 1). The plaintiff names the following defendants in the complaint: Sergeant Tim Ray of the Lauderdale County Sheriff's Department; Dr. Laura Lindsey and Nurse Myra Brown of the Lauderdale County Detention Center medical staff. (*Id.* at 3). The plaintiff seeks compensatory damages and injunctive relief. (*Id.* at 4). In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

## I. Procedural History

On January 17, 2017, the undersigned entered an Order for Special Report, directing the Clerk to forward copies of the complaint to each of the named defendants and directing the defendants to file a special report addressing the plaintiff's factual allegations. (Doc. 8). The undersigned advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*Id.*).

On March 14, 2017, defendant Tim Ray filed a special report, supplemented by affidavits, a video purporting to be of the incident made the basis of the plaintiff's claims, and other evidence. (Docs. 24 & 25). Defendants Dr. Lindsey and Nurse Brown (the "medical defendants") filed their special report on May 1, 2017. (Doc. 32). In response to the medical defendants' special report, the plaintiff filed a pleading titled "Motion to Enter Evidence," wherein he sought to submit certain documents he contends "show proof of diabetes before [his] date of incarceration." (Doc. 33). By order entered May 17, 2017, the undersigned allowed the plaintiff to submit the documents, but made no ruling as to the relevancy or admissibility of the documents. (Doc. 34).

Also on May 17, 2017, the undersigned notified the parties that the court would construe the special reports collectively as a motion for summary judgment and notified the plaintiff that he had twenty-one days to respond to the motion by filing affidavits or other material. (Doc. 35). The undersigned also advised the plaintiff of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. (*Id.*) (citing *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985)). On June 9, 2017, the plaintiff filed an unsworn response to the motion for summary judgment (doc. 41), and on October 2, 2017, he submitted a pleading titled "Motion for Summary Judgment." (Doc. 42).

## II. Standard of Review

Because the court has construed the defendants' special reports as a motion for summary judgment, Federal Rule of Civil Procedure 56 governs the resolution of the motion. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023

(11th Cir. 2000). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). "*Pro se* pleading are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).

### III. Summary Judgment Facts

On the evening of February 17, 2016, the plaintiff led law enforcement officers on a high-speed chase through Alabama and Tennessee. (Doc. 24-2 at 2, ¶ 3). The chase began in Alabama,

when the plaintiff failed to stop for Alabama State Troopers on Lauderdale County Road 8. (*Id*. at 3, ¶ 5). After being notified of the incident, defendant Sergeant Tim Ray of the Lauderdale County Sheriff's Office joined in the pursuit on County Roads 7 and 139, and continued to chase the plaintiff as he crossed into Tennessee. (*Id*. at 3, ¶¶ 6-7). The plaintiff eventually turned south onto the Natchez Trace Parkway and crossed back into Alabama, at which point spike strips were placed in his path, damaging his front tires. (*Id*. at 3, ¶¶ 8-10). The plaintiff rammed a State Trooper's vehicle "multiple times" until a "pit maneuver" by another State Trooper ended the chase. (*Id*. at 3, ¶ 11-12).

The plaintiff's vehicle came to a stop with the back half hanging off the side of a hill, and when defendant Sergeant Ray and other officers went to arrest the plaintiff, they all (including the plaintiff) fell down the embankment. (Doc. 24-2 at 5, ¶¶ 13-14)[1] A video of the incident, although at times difficult to see, appears to confirm that the plaintiff and officers rolled down an embankment, and that the plaintiff complained immediately about having a broken leg. (Doc. 24-3). During the initial struggle to apprehend the plaintiff the video is too dark to see the events taking place, but there is no audio evidence of the plaintiff being "assaulted" by the officers. Instead, it appears they are attempting to gain control of the plaintiff's arms to apply handcuffs, and all physical force ceases within approximately one-hundred and fifteen seconds. (*Id*. at 2:45 to 4:40 (video minutes))[2]

---

[1] In his complaint, the plaintiff alleges he was dragged from his vehicle and "assaulted" by the officers, resulting in a broken leg and foot and "multiple other injuries." (Doc. 1 at 3). Defendant Sergeant Ray testifies the plaintiff "informed one of the State Troopers that he had broken his leg after falling off a ladder earlier that day." (Doc. 24-2 at 4, ¶ 15).

[2] The audio of the events indicates the plaintiff was being uncooperative, as the officers had to continually yell at him to "give us your hands" and "relax your hand" so that handcuffs could be applied. (Doc. 24-3, at 3:19-4:00 (video minutes)).

The plaintiff was taken by ambulance to the Eliza Coffee Memorial Hospital Emergency Room, accompanied by a State Trooper, where it was observed he had "multiple facial abrasions and contusions," swelling and tenderness to his nose and forehead, and where x-rays revealed he had suffered a "minimally displaced tibial plateau fracture of his left knee." (Docs. 32-1 at 5, ¶ 13; 32-4 at 53).[3]  The hospital provided him pain medication, a brace, and crutches. (Doc. 32-1 at 5, ¶ 13).  The plaintiff was taken to North Alabama Bone and Joint on February 19, 2016, where he was examined by Dr. Jonathan Wright, who, after reviewing the emergency room x-rays, determined the fracture was "minimally displaced," and therefore could be treated "non-operatively" by keeping the knee "nonweightbearing." (Docs. 32-1 at 5, ¶ 14; 32-4 at 39-40).

The plaintiff was booked into the Lauderdale County Detention Center on February 24, 2016, where he was seen by a nurse the next day for an initial medical screening. (Doc. 32-1 at 4, ¶ 11).  He told the nurse he had been in an accident on February 17, 2016, and that he had been diagnosed with a broken left knee. (*Id.*).  He also told the nurse he had a history of mental health problems, had suffered from stomach cancer and hepatitis C, and was taking the medications Neurontin, Glucophage, and Percocet. (*Id.*).[4]  At that time, Dr. Lindsey prescribed the plaintiff one dose of Tylenol 500mg. (*Id.* at 5).  The plaintiff also signed medical release forms for the jail medical staff to obtain his medical records from Eliza Coffee Memorial Hospital and North Alabama Bone and Joint. (*Id.* at 5, ¶¶ 12-13).

---

[3] The undersigned has found nothing in the hospital record to indicate a broken foot, as the plaintiff alleges in his complaint. (Doc. 32-4 at 47-63).

[4] It appears from the "Medical Staff Receiving Screening Form" dated February 25, 2016, that the plaintiff also indicated that he suffered from diabetes. (Doc. 32-3 at 56).

On February 29, 2016, Dr. Wright from North Alabama Bone and Joint prescribed the plaintiff ibuprofen 800mg every eight hours as needed for pain, but on that same day, Dr, Lindsey altered the prescription slightly by issuing a medical order for ibuprofen 800mg *twice* per day for seven days. (Doc. 32-1 at 6, ¶ 15).  The plaintiff was provided this medication as ordered, but on March 7, 2016, he submitted a sick call slip stating that he might have broken the lower part of his leg while in the lockup. (*Id*. at ¶¶ 15-16).  Dr. Lindsey saw the plaintiff on March 11, 2016, at which time he was using crutches and his leg was in an immobilizer. (*Id*. at ¶ 18).  The plaintiff told Dr. Lindsey he was there to complain about left leg pain from the earlier break, and asked to be released from jail so he could have surgery. (*Id*.).[5]  Dr. Lindsey advised him to keep his leg in the immobilizer and ordered that he could obtain ibuprofen from the commissary. (*Id*.).  She also directed him to follow up with his orthopedist. (*Id*.).

On March 25, 2016, the plaintiff saw Dr. Lindsey again, who advised the plaintiff to continue using the immobilizer for his broken knee. (Doc. 32-1 at 7, ¶ 19).  At that same meeting, the plaintiff advised that he was a diabetic, prompting Dr. Lindsey to order his blood sugar to be checked daily.  (*Id*.).  The plaintiff's blood sugar was check regularly throughout the month of April 2016, and based on the results, Dr. Lindsey's opined the plaintiff's blood sugar was within acceptable range and there was no need for diabetic medication at that time. (*Id*. at ¶ 21).[6]

---

[5] Nothing in the record indicates the plaintiff actually broke his leg a second time, as he alleged in the March 7, 2016 sick call slip.

[6] Dr. Lindsey explains the plaintiff has Type II diabetes mellitus, which can be controlled through diet and/or medications or insulin. (Doc. 32-1 at 11).  She testifies that during the 12-month period from February 2016 to February 2017, the plaintiff's blood sugar levels were within medically acceptable range, and that medication was not required. (*Id*.).  It wasn't until February 24, 2017, that the plaintiff's blood sugar levels rose to a point which required medication, at which time he was prescribed the medication Glucophage, which has "adequately controlled" his diabetes since. (*Id*.).

On April 8, 2016, the plaintiff limped into the medical unit without his crutches and stated his leg was fine and that he wanted to be housed in general population. (Doc. 32-1 at 7, ¶ 20). He told Dr. Lindsey that he no longer wanted to be under the care of the orthopedic specialist, no longer wanted to use his crutches, and wanted to sign a release allowing him to live in general population. (*Id.*). Despite his requests, Dr. Lindsey directed that the plaintiff remain on his crutches and in his current cell, and she encouraged him to keep weight off his injured leg until his next orthopedic appointment. (*Id.*).[7] She also prescribed ibuprofen 800mg twice per day for ten days. (*Id.*).

Dr. Lindsey prescribed ibuprofen 400mg on June 17, 2016, when the plaintiff complained of leg cramps, and on July 1, 2016, the plaintiff returned to the medical office complaining of nerve pain in the back of his legs and asked to be placed on Neurontin. (Doc. 32-1 at 8, ¶¶ 24-25). He also asked to be placed on the diabetic medication Glucophage. (*Id.* at ¶ 25). Dr. Lindsey prescribed Neurontin 300mg once per day for the leg pain, but declined to prescribe Glucophage since the plaintiff's blood sugar levels "were within medically acceptable range" at that time. (*Id.* at ¶ 25).[8] However, Dr. Lindsey ordered the plaintiff's blood sugar levels be checked three times per week. (*Id*).

During the ensuing months, Dr. Lindsey continued to provide the plaintiff with Neurontin to address his leg pain (doc. 32-1 at 11, ¶ 35), and continued to regularly prescribe ibuprofen, including 800mg twice per day for seven days on August 10, 2016 (*Id*. at 9, ¶ 26); 600mg twice

---

[7] On May 11, 2016, the orthopedic specialist reported the plaintiff was doing "extremely well" and could discontinue use of the brace and crutches. (Doc. 32-1 at 8, ¶ 22).

[8] On October 6, 2016, the plaintiff's Neurontin dosage was increased to twice per day after he complained that the original dosage was not strong enough. (Doc. 32-1 at 9, ¶ 28).

per day for seven days on October 6, 2016 (*Id*. at 9, ¶ 28); 400mg twice per day for seven days on November 17, 2016 (*Id*. at 9, ¶ 29); 400mg twice per day for seven days on December 24, 2016 (*Id*. at 9-10, ¶ 31); and 400mg twice per day for seven days on February 7, 2017. (*Id*. at 10, ¶ 33). Dr. Lindsey also testifies without refute that Neurontin and ibuprofen are appropriate and effective treatments for the plaintiff's complaints of leg pain. (*Id*. at 10-11, ¶¶ 34-35).

## IV. Analysis

### A. Excessive Force

The prohibition against unreasonable searches and seizures as guaranteed by the Fourth Amendment "encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (*quoting Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir 2002)).[9] However, a police officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id*. The question then becomes "whether the officer's actions are objectively reasonable in light of the circumstances confronting him, without regard to his underlying intent or motivation." *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004) (quoting *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004)). Accordingly, the use of force during an arrest "must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Vinyard,* 311 F.3d at 1347 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)) (internal quotation marks omitted).

---

[9] In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court made "explicit" what had been inferred by earlier rulings that "*all* claims that law enforcement officers have used excessive force - deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."

Regarding the reasonableness of force used during an arrest, the court must observe "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Vinyard*, 311 F.3d at 1347 (quoting *Lee*, 284 F.3d at 1197). To determine whether the use of force in a particular situation is necessary, courts consider factors including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting or attempting to evade arrest by flight. (*Id.*) (quoting *Graham*, 490 U.S. at 396); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017). During this evaluation, the court must remember that claims of excessive force are "fact-specific," and the determination of whether force was reasonable "requires careful attention to the facts and circumstances of each particular case." *DeGiovvanni*, 852 F.3d at 1315.

Here, the undisputed facts demonstrate defendant Sergeant Ray's use of force was necessary in light of the totality of the circumstances. Although the plaintiff's initial crime appears to have been minor; i.e., driving without a tag, he subsequently led police on a high-speed chase across state lines and rammed a State Trooper's car multiple times before finally being forced off the road. (Doc. 24-2). In any reasonable officer's mind, these would be serious and potentially life-threatening events, creating an immediate threat to officers and the public. Furthermore, audio from the video reveals that force was *necessary* to restrain the plaintiff because he was being uncooperative. (Doc. 24-3, at 3:19-4:00 (video minutes)) (audio of the officers repeatedly telling the plaintiff to "give us your hands" and "relax your hand" so that handcuffs could be applied).

As to whether the *amount* of force used, additional factors are examined to determine whether the *amount* of force used was "reasonably proportionate to the need for that force." (*Id.* at 1324). Those factors are (1) the need for the application of force; (2) the relationship between the

9

need and amount of force used; and (3) the extent of injury inflicted. *DeGiovanni*, 852 F.3d at 1324. (quoting *Vinyard*, 311 F.3d at 1347).

Here, there was a clear need to use force to apprehend the plaintiff, who had placed officers in physical danger in his efforts to avoid arrest.  Furthermore, it is undisputed the plaintiff and the officers inadvertently fell down an embankment during the arrest, and the video evidence demonstrates the plaintiff was initially uncooperative with the officers' efforts to handcuff him.  Nothing in the record demonstrates the officers' use of force exceeded the need for force under the circumstances, and the plaintiff offers no specific evidence to refute defendant Sergeant Ray's special report.  Additionally, although the plaintiff suffered a fracture of his left knee, along with multiple facial contusions and abrasions, he offers no specific evidence of causation to show defendant Sergeant Ray engaged in any objectively unreasonable action to cause those injuries, as opposed to the fall down the embankment, and the officers' reasonable efforts to restrain him.[10]  In other words, there is no specific evidence before the court to demonstrate the plaintiff's injuries were the result of excessive force, but instead appear to be the result of the particular, and somewhat unusual, circumstances surrounding the events of February 17, 2016, including the fact that he fell down an embankment during efforts to restrain him.  As such, his injuries are not disproportionate to the need for force the officers faced that evening.  The undersigned therefore

---

[10] There is caselaw allowing for a plaintiff's sworn complaint to be asserted in opposition to summary judgment in order to create genuine issues for trial. *See Perry v. Thompson*, 786 F.2d 1093 (11th Cir. 1986).  However, that authority allows for the *specific* facts in a sworn complaint to be presented in opposition to summary judgment.  In this instance, the plaintiff may not rely on the vague and general allegations in his complaint asserted collectively against the arresting officers to address the specific showings defendant Sergeant Ray has made. "[I]n a 1983 action, a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Cabbil v. McKenzie*, 595 Fed. Appx. 843, 847 (11th Cir. 2014) (*quoting Keating v. City of Miami*, 598 F.3d 753, 762-63 (11th Cir. 2010)) (emphasis added).

finds that there is no genuine issue of material fact as to the plaintiff's excessive force claim and that Sergeant Tim Ray is entitled to summary judgment as a matter of law.

## B. Medical Claims

The plaintiff alleges Nurse Brown and Dr. Lindsey refused him medication and treatment. (Doc. 1 at 4). The plaintiff, however, has failed to refute the medical defendants' special report that demonstrates his medical issues were adequately addressed during the time he was in the Lauderdale County Detention Center.[11]

To establish an Eighth Amendment violation for denial of adequate medical care, the plaintiff must produce evidence that he suffered from an objectively serious medical need and that medical defendants were subjectively indifferent to that need. *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989). Accordingly, medical treatment of prisoners violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (*quoting Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1991)) (internal quotations omitted). The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). Therefore, negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment. (*Id*. at 106); *McElligot v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). Likewise, a mere difference of opinion between an inmate and the prison

---

[11] In addition to the specific medical treatment outlined above, Dr. Lindsey testifies unequivocally that the plaintiff "was never denied any medications that were reasonably necessary for his medical treatment," and that he "has received medical attention for every medical condition which he has brought to the attention of Jail medical personnel." (Doc. 32-1 at 4).

medical staff as to treatment or diagnosis will not, alone, give rise to a cause of action under the Eighth Amendment. *Harris*, 941 F.2d at 1505.

In this instance, the plaintiff has failed to refute the medical defendants' special report outlining the extensive history of care he received at the Lauderdale County Detention Center, and he presents no evidence of conduct on the part of the defendants that would constitute the "deliberate indifference" necessary to assert a constitutional claim.  Once the defendants made their showing, it was incumbent upon the plaintiff to submit evidence to demonstrate that members of the jail medical staff were subjectively indifferent to his serious medical condition.  However, he presents nothing even approaching a showing that his medical treatment was so inadequate as to "shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505. In the face of the defendants' evidence, the plaintiff points to nothing in the record to demonstrate the course of treatment he received "was so far afield [from accepted professional practice] as to allow a jury to infer deliberate indifference." *See Duckworth v. Ahmad*, 532 F.3d 675, 680 (11th Cir. 2008).  Accordingly, he has failed to demonstrate a genuine issue of fact with respect to a critical element of his Eighth Amendment claim.  Having failed to do so, the medical defendants are entitled to judgment as a matter of law.

## V. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS** the plaintiff's motion for summary judgment (Doc. 42) be **DENIED**.  The undersigned **FURTHER RECOMMENDS** that the defendants' motions for summary judgment (doc.'s 24, 25, & 32) be **GRANTED** and this action be **DISMISSED WITH PREJUDICE**.

**VI. Notice of Right to Object**

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection. Failure to object to factual findings will bar later review of those findings, except for plain error. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013). Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

Upon receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the findings of fact and recommendations made by the magistrate judge. The district judge must conduct a hearing if required by law. Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence. Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record. The district judge also may refer this action back to the magistrate judge with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may only appeal from a final judgment entered by a district judge.

DONE this 22nd day of January, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE